## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL and CATHERINE BURKE,

      *Plaintiffs*,

     v.

KATE WALSH, in her official capacity as
Secretary of the Massachusetts Executive
Office of Health and Human Services,
LINDA SPEARS, in her official capacity
as Commissioner of the Massachusetts
Department of Children & Families,
LAURIE SULLIVAN, in her personal
capacity and in her official capacity as the
Area Director of the Western Regional
Office of the Massachusetts Department
of Children & Families, ANNA
MOYNAHAN, in her personal capacity
and in her official capacity as the
Regional Clinical Director of the
Massachusetts Department of Children &
Families, THERESA HARRIS, in her
personal capacity and in her official
capacity as the Regional Program
Manager of the Massachusetts
Department of Children & Families,
DAWN SWEETMAN, in her personal
capacity and in her official capacity as an
ADLU Supervisor for the Massachusetts
Department of Children & Families,
TYWANNA JONES, in her personal
capacity and in her official capacity as an
ADLU Social Worker for the
Massachusetts Department of Children &
Families, CAITLYN LEVINE, in her
personal capacity and in her official
capacity as a Mental Health Specialist for

Case No. _____

**VERIFIED COMPLAINT**

the Massachusetts Department of
Children & Families, STACY CLARK in
her personal capacity and in her official
capacity as a Quality Assurance
Supervisor for the Massachusetts
Department of Children & Families, and
EUPHEMIA MOLINA, LUZ ESTRADA,
and ANGEL EMERSON in their personal
capacities and in their official capacities
as License and Training Supervisors for
the Massachusetts Department of
Children & Families,

*Defendants.*

## NATURE OF THE ACTION

1.    Michael and Catherine Burke are a loving couple who want to welcome
children into their family. After experiencing the heartbreak of infertility, Mike and
Kitty decided to become foster parents, with the hope of caring for and eventually
adopting children in need of a stable, loving home.

2.    The Burkes applied to become foster parents through the Massachusetts
Department of Children and Families (DCF). They went through thirty hours of
training, lengthy interviews, and assessments of their home, health, and family life.

3.    In the end, DCF "[a]cknowledged" the "family['s] strengths, this including
their willingness to parent a child w/ moderately significant medical, mental health
and behavioral needs." Ex. 1 at 3. One interviewer praised how they "really seem[] to
understand adoption/foster care." *Id*. at 12.

4.    But DCF denied the Burkes a foster care license, and, as such, their last
opportunity to become parents.

5.    Only one reason was given for that denial: they "would not be affirming to a
child who identified as LGBTQIA." Ex. 1 at 3. As DCF recorded, "Kitty and Mike are

devoutly Roman Catholic and not only attend church with regular frequency, they both also work for local churches as musicians." Ex. 2 at 3.

6. As faithful Catholics, the Burkes believe that all children should be loved and supported, and they would never reject a child placed in their home. They also believe that children should not undergo procedures that attempt to change their God-given sex, and they uphold Catholic beliefs about marriage and sexuality.

7. Because of those decent and honorable beliefs, DCF decided the Burkes were not "affirming," and therefore prohibited from fostering any child in Massachusetts.

8. As the author of their license study put it, while the Burkes are "lovely people," "their faith is not supportive and neither are they." Ex. 1 at 12.

9. In effect, DCF has interpreted its regulations, which require foster families to "support[] and respect[] a child's sexual orientation or gender identity," 110 CMR 7.104(1)(d), as an absolute bar for Catholics who agree with the Church's teaching on sex, marriage, and gender.

10. This exclusion is particularly striking, given DCF's need for more foster homes. DCF is in desperate need of loving families like the Burkes—it has a yearslong shortage of foster families, leaving some children to be kept in DCF offices or even housed in hospitals while they wait for a caring home.

11. Yet at the same time, DCF regulation and policy—and the Massachusetts Foster Parent Bill of Rights—all prohibit religious discrimination against potential foster parents.

12. DCF's actions are discriminatory and unconstitutional. As a federal district court held when enjoining similar regulations in Washington State, "[i]f the only factor weighing against an otherwise qualified applicant has to do with their sincerely held religious beliefs, the Department must not discriminate against a foster care applicant based on their creed." *Blais v. Hunter*, 493 F. Supp. 3d 984, 1002 (E.D. Wash. 2020).

13.   The Supreme Court has already—unanimously—rejected the attempt to exclude Catholic foster care agencies from the child welfare system. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). And the Third Circuit held that the First Amendment prohibits retaliation against foster parents for sharing their religious beliefs on marriage. *See Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *4-7 (3d Cir. Mar. 1, 2022). Exclusion of Catholic couples is equally unconstitutional.

14.   DCF's religious discrimination means that any Massachusetts family with similar religious beliefs on human sexuality will be banned from ever fostering or adopting children through Massachusetts' child welfare system. The rule would extend to many Muslims, Jews, Protestant Christians, and other groups who have similar religious teachings. "The Constitution neither mandates nor tolerates that kind of discrimination." *Kennedy v. Bremerton*, 142 S. Ct. 2407, 2433 (2022). DCF should affirm loving foster families, not banish them.

## JURISDICTION AND VENUE

15.   This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16.   The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

17.   Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of Massachusetts.

18.   Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the District of Massachusetts.

## THE PARTIES

19.   Plaintiff Michael (Mike) Burke is a resident of Southampton, MA. He is an Iraq war veteran and small-business owner. He is also an organist for multiple parishes within the Catholic Diocese of Springfield.

20.   Plaintiff Catherine (Kitty) Burke is a resident of Southampton, MA. She is a former special education caregiver and a small business owner. She is also a cantor for the Catholic Diocese of Springfield.

21.   Defendant Kate Walsh is the Secretary of the Massachusetts Executive Office of Health and Human Services. She is sued in her official capacity only. She has ultimate responsibility for the policies, procedures, and official decisions of DCF.  Her office is located in Boston, Massachusetts.

22.   Defendant Linda Spears is the DCF Commissioner. She is sued in her official capacity only. She has oversight of DCF's policies, procedures, and official decisions, including the Burkes' license denial. Her office is located in Boston, Massachusetts.

23.   Defendant Laurie Sullivan is the Area Director for the Western Regional Office of DCF. She is sued in her official and personal capacities. Her role means that she has authority over and responsibility for the Burkes' license denial.

24.   Defendant Anna Moynahan is a Regional Clinical Director at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

25.   Defendant Theresa Harris is a Regional Program Manager at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

26.   Defendant Dawn Sweetman is an ADLU Supervisor at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

27.   Defendant Tywanna Jones is an ADLU Social Worker at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who

made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

28.   Defendant Caitlyn Levine is a Mental Health Specialist at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

29.   Euphemia Molina is a License and Training Supervisor at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

30.   Stacy Clark is a Quality Assurance Supervisor at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

31.   Luz Estrada is a License and Training Supervisor at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

32.   Angel Emerson is a License and Training Supervisor at DCF. She is sued in her official and personal capacities. As a member of the Licensing Review Team who made the decision to deny the Burkes' license, she was directly involved in the Burkes' license denial.

## FACTUAL BACKGROUND

### *The Burkes*

33.   Both Mike and Kitty Burke are lifelong residents of the Springfield area. Kitty first met Mike in a "mommy and me" swim class when they were children. After high school, they went separate ways.

34.   Kitty worked as a substitute teacher and a paraprofessional in a 1:1 capacity. In that role, she helped children with special needs, which has given her the skills and understanding to know what special needs children require.

35.   Kitty remains close to her extended family, who have been a loving community and valuable support system for her.

36.   Kitty has also found purpose, meaning and comfort in her Catholic faith. Kitty was raised in the Catholic Church, and her mother was a musician for their church. Kitty followed in her mother's footsteps, and today she performs at multiple Masses for the Diocese of Springfield.

37.   Mike enlisted in the Marine Corps and was sent to Iraq. Mike served in the Marine Corps from 2002 to 2006. Mike's deployment ended in 2005, and after he returned home, he was honorably discharged from the Marine Corps the following year.

38.   As a result of his experiences in Iraq, Mike suffered from post-traumatic stress disorder, or PTSD. He received treatment and built a new life after completing his military service. His experiences have given him compassion and insight into the needs of others who suffer from trauma.

39.   Mike has also found purpose, meaning, and comfort in his Catholic faith. Mike was raised in the Catholic Church and is an organist. Today, he performs at multiple Masses for the Diocese of Springfield, including for the Traditional Latin Mass.

40.   Several years ago, Mike saw Kitty on Facebook and decided to reach out to her. He had been romantically interested in her in high school.

41.   Mike and Kitty soon began dating, and were married on June 8, 2018, in the Holy Trinity Church in Westfield.

42.   Mike and Kitty were eager to become parents but knew that it could be difficult due to health problems. They experienced the heartbreak of infertility.

43.   Mike and Kitty then decided to welcome an adoptive child into their home. They sought out a private adoption agency and completed a home study. However, costs were mounting, and they had to discontinue the process because they had not yet been matched with a child and were unable to afford the extremely high fees of private adoption.

44.   Before they stopped the process, an adoption agency completed the home study and recommended that Mike and Kitty be approved as adoptive parents.

45.   Unable to afford private adoption, Mike and Kitty began to explore becoming foster parents through DCF. They had friends who worked with DCF, and those friends indicated they would be ideal candidates.

46.   Mike and Kitty went through a lengthy research process and learned about the child welfare system. They understood that, as foster parents, they would seek reunification of the family, and they were willing to accept their role as temporary caregivers.

47.   Mike and Kitty were also open to adopting children who could not be reunified with their birth families. They were willing to accept sibling groups.

48.   DCF prioritizes finding homes where sibling groups can be placed together, which protects sibling bonds and avoids further trauma of separation. Not all foster families are able to take in multiple children in a sibling group.

49.   But the Burkes were.

50.   They were also happy to welcome a child of any racial, cultural or ethnic background into their family.

51.   They were also willing to welcome children with certain special needs into their home. Many children experiencing foster care have special needs, and DCF prioritizes finding homes who can care for those children.

### DCF and the need for more foster families in Massachusetts

52.  Families who wish to become foster families, or resource parents, contact the Massachusetts Department of Children and Families, DCF.

53.  The Commonwealth has a foster care crisis. Despite a regulatory commitment to minimize the number of foster children in foster care at any given time (110 CMR 7.101(9), DCF does not currently have sufficient foster care homes or facilities to meet the needs of the children in its care.

54.  According to DCF's most recent report, there are 7,810 children in the Massachusetts foster care system. Of those, 1,521 (about 19 percent) are not currently placed with families. *Massachusetts Department of Children & Families Quarterly Profile – FY'2023, Q3 (01/01/23 – 03/31/22)*, at 1 (June 27, 2023), https://perma.cc/PV7F-UY4C. Over 200 children in the care of DCF are currently being housed in a "Non-Referral Location," meaning they are in a facility such as a "hospital" or "other state agency." *Id.*

55.  DCF has also used what it called a "last resort" by housing dozens of children in hospitals for weeks on end—not because the children needed medical attention, but because DCF had nowhere else to put them. Elizabeth Koh, *A 15-year-old stayed in a hospital for 40 days. The reason? The state child welfare agency had no place to put him.*, Boston Globe (Feb. 11, 2023), https://perma.cc/62XJ-DSU3.

56.  Some children housed in hospitals were not allowed to leave their rooms except to use the bathroom or to shower during their stay. *See id.*

57.  This confinement caused the already traumatized children additional and unnecessary anxiety and disturbance.

58.  DCF has on multiple occasions in recent years had to house children in its own offices—which are not equipped for overnight stays—because there were not enough beds in foster homes, group homes, or other placements.

59.  The Western Regional Office (which covers the area where the Burkes reside) reported that over 300 children within its jurisdiction are currently not placed with families. *DCF Quarterly Profile,* at 59.

60.  Twenty-four of those children are in a "Non-Referral Location." *Id.*

61.  On information and belief, at least some of the children currently being housed in a "Non-Referral Location" are awaiting placement in an approved foster home or foster care facility.

### Massachusetts recruits and welcomes religious families into the foster care system.

62.  To meet this foster care crisis, the Commonwealth has statutory, regulatory, and policy commitments to maximize foster parents, including parents from diverse faith groups.

63.  This year, Massachusetts passed a law requiring DCF to "establish a foster parents' bill of rights, which shall be a policy governing the department's relationship with, and responsibilities to, foster parents." Mass. Gen. Laws ch. 119 § 23C(a).

64.  The law guarantees that "[a] foster parent may make routine decisions about the foster child's daily activities and may continue practicing the foster parent's own family values and routines, excluding physical discipline, while respecting the foster child's culture, background, trauma history and preferences." *Id.* at (b)(xix).

65.  The law also underscores "the importance of providing the foster child with the most family-like living experience possible." *Id.* at (e).

66.  The law's guarantees track DCF's own commitment to welcome all families, including religious families, into the foster care process.

67.  For instance, DCF's licensing policy "regards foster parents as valued partners." Ex. 3 at 2 (DCF Policy on Licensing of Foster, Pre-Adoptive, and Kinship Families, effective Feb. 27, 2023). To build those partnerships, "the Department welcomes and recruits foster families from diverse communities." *Id.* at 13. That's

because "[c]hildren in care come from many different backgrounds, so it is important to have a group of diverse foster parents, who understand and have compassion for their experiences." *Id.*

68. DCF uses "faith based organizations" to recruit diverse foster families. 110 CMR 7.100(1); *see also id.* at 1.09(2) ("110 CMR 1.00 does not prohibit the Department from recruiting foster parents or adoptive parents from groups of persons of specific . . . religion . . . to permit the pool of available foster and pre-adoptive families to reflect the ethnic and racial diversity of the children needing placement in substitute care.").

69. As in DCF's own regulations and policies, Massachusetts's foster parents' bill of rights protects "prospective foster . . . parents during the application process" from discrimination, including "on the basis of religion." Mass. Gen. Laws ch. 119 § 23C(a)-(b)(ii); *see also* Ex. 3 at 13 ("The Department does not deny any adult the opportunity to become a foster family on the basis of . . . religion."); 110 CMR 1.09(3) (prohibiting DCF from "deny[ing] to any person the opportunity to become an adoptive or foster parent, on the basis of the . . . religion . . . of the person, or of the child, involved.").

### *The licensing process is subjective and tailored to each foster family.*

70. DCF implements the foregoing guarantees through numerous, overlapping, discretionary, and individualized processes, tailored to each potential foster family.

71. "The Department's approach to licensing [a potential foster family] occurs in purposeful stages of assessment. . . . Each stage builds upon information learned about the family in the previous stage so that assessment is ongoing and cumulative, formulating a comprehensive clinical understanding of the family's caregiving capacity." Ex. 3 at 2.

### *Initial screening stage.*

72. When a family reaches out to DCF about becoming licensed, "the Department shall conduct an initial screening process to determine if the individual and any household member meets the Department's initial eligibility criteria." 110 CMR

7.100(2). If initial eligibility criteria (*see id.* at 7.100(3)-(4)) is met, DCF then proceeds to analyze the potential foster family. *See id.* at 7.101.

### The "Application Review" stage.

73.   DCF then opens a file on the family and the family submits a detailed application. *See id.* at 7.103(1)-(2); *id.* at (3) (required application "information and consent"). "The application review includes a home visit and the initiation of background checks." Ex. 3 at 2; *see also id.* at 14.

### The "Caregiver Assessment" stage.

74.   A potential foster family only moves on to "Caregiver Assessment" if the "Application Review" stage shows that: (1) "their home meets the basic housing requirements;" (2) "all household members lack a disqualifying criminal or child welfare history;" and (3) "the Recruiter and their supervisory recommend that the family proceed." *Id.* at 16.

75.   If those requirements are all met, then the potential foster family "enrolls in foster parent training," and a detailed, subjective, individualized assessment of their life begins "within 60 working days." *Id.* at 17; *see also* 110 CMR 7.107 (describing the "comprehensive assessment" inquiry).

76.   During that window, a License and Training Social Worker ("LTSW" or "social worker") "visits the prospective foster family at least three times. At least two of those visits must occur in the family's home. For prospective foster families with two parents, the LTSW must interview each parent individually at least once and together at least once." Ex. 3 at 19.

77.   The goal of this assessment is to determine whether the potential foster family can offer "loving child-specific environments while helping to facilitate permanency for the child through reunification or adoption." *Id.* at 18.

78.   To facilitate this assessment, DCF evaluates the potential foster family against (among other things) its "Standards for Licensure as a Foster/Pre-adoptive

Parent." 110 CMR 7.104; *see also* 110 CMR 7.107(2)(m) ("The comprehensive assessment will be performed by the Department in accordance with 102 CMR 5.10(5) and shall include at least the following . . . (m) confirmation that the applicant(s) and the home meet the standards established by 110 CMR 7.104 and 7.105.").

### *The subjectivity of the "Caregiver Assessment" inquiry.*

79. Using the "Standards for Licensure as a Foster/Pre-adoptive Parent," the social worker makes several discretionary, subjective judgments about the potential foster family.

80. Specifically, DCF regulation requires that the social worker determine whether the foster parent: **(1)** possess 17 various qualities "*to the satisfaction of the Department*" (*Id.* at 7.104(1)(a)-(q) (emphasis added)); **(2)** have a household "free of" certain "handicap[s] . . . *in the judgment of the Department* (*id.* at 7.104(2) (emphasis added)); **(3)** lack a criminal record, that "*in the judgment of the Department*," "bears upon" being a foster parent (*id.* at 7.104(3) (emphasis added); **(4)** have a household with "sufficient income and appropriate fiscal management" (*id.* at 7.104(4)); **(5)** have a home that meets the 18 standards (and sub-parts) articulated in another regulation, while some are waivable (*id.* at 7.104(5) (citing 7.105); *see also id.* at 7.105(12)(b) (home capacity limitations)); **(6)** be a U.S. citizen or permanent legal resident, unless DCF wants to waive that too (*see id.* at 7.104(6); *see also id.* at 7.105A (waiver provision)); and **(7)** meet "the initial eligibility criteria" from the earlier screening (*id.* at 7.104(7)).

81. The 17 qualities a family must show "to the satisfaction of the Department" are especially subjective. For example, such qualities include whether the social worker thinks the potential foster parents have "reasonable expectations of a child's behavior and potential growth" (*id.* at 7.104(1)(p)); that they can "deal with difficult issues in the child's background, and be able to talk with the child comfortably and constructively about his/her birth parents" (*id.* at 7.104(1)(o)); that they can "draw

upon community and professional resources as needed," (*id.* at 7.104(1)(m)); and that they can "manage the stressful situations which are frequently associated with the placement of a child in substitute care," (*id.* at 7.104(1)(f)).

82.   The social worker interviews and observes the family to make these subjective judgments—and DCF provides "guidance" on what to ask in its licensing policies. *See* Ex. 3 at 19; *see also id.* at 38-45 ("sample questions"). These questions "will need to be tailored to the families being interviewed, and follow-up questions will need to be formulated based on responses from the family members." *Id.* at 38.

### *How DCF interprets the requirement to "support[] and respect[] a child's sexual orientation or gender identity."*

83.   Among the 17 subjective demonstrations assessed by the social worker is whether, "to the satisfaction of the Department," the potential foster parents can "promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity." 110 CMR 7.104(1)(d).

84.   DCF provides "sample questions" to address this topic, under the heading of "cultural humility." Ex. 3 at 42.

85.   DCF suggests the social worker to ask the following "sample questions," several of which touch on the parents' religious beliefs (*id.* at 42-43):

> a.   "Tell me about your religious or spiritual beliefs, viewpoints, or practices. Are you currently affiliated with any particular religious or spiritual group? If so, please identify the group. How often do you congregate?"
>
> b.   "What religious expectations or requirement do you have for children in your home? Describe any religious practices or beliefs you embrace. How will they influence your ability to care for children who come into care?"

c. "Do you consider your current neighborhood and wider community affirming for a child(ren) from a diverse ethnic/cultural background? Explain."

d. "What areas of life do you suspect religion, sexual orientation, or gender identity might affect? Give examples."

e. "Describe the ways you would support and maintain a child's culture, including a child's religion, ethnicity, sexual orientation or gender identity/expression, while living in your home."

f. "Describe how you would protect/prepare/defend a foster or adopted child from negative and/or unfair comments in a public setting such as a grocery store, church or park."

g. "Similarly, how would you protect/defend a foster or adopted child from negative and/or unfair comments from within your personal circle such as other family member(s), friends, and neighbors?"

86. No standard—except "the satisfaction of the Department" (110 CMR 7.104(1))—is provided to determine the right answer to these questions, or what "supporting and respecting" means.

87. DCF's sample questions do not provide guidance on how to interpret the "cultural humility" questions, or the "supporting and respecting" standard consistent with DCF's obligation to prohibit religious discrimination against potential foster parents. *Supra* ¶¶ 83, 85-86.

88. DCF also has a commitment that its "staff do not impose their personal, cultural, and/or religious beliefs on children and families involved with the Department." Ex. 4 at 4 (LGBTQIA+ Nondiscrimination Policy, effective 6/30/2022).

***The "License Review" stage contains further subjectivity and discretion.***

89. After the social worker prepares the "Caregiver Assessment," a License Review Team ("LRT" or "Team") is assembled to "examine[] information gathered

15

during Recruitment, Application Review, and Caregiver Training and Assessment to form an understanding of the family." Ex. 3 at 26.

90.   "For Foster Homes," the Team consists of the social worker that conducted the Caregiver Assessment, that person's supervisor, the Regional Program Manager, and the "[Foster Family Social Worker] receiving the home," the Ongoing Supervisor or Manager from the Administrative Office where the home is, and the Regional Supervisor or Regional Manager facilitates the discussion. *See id.* (chart).

91.   As with every other stage of the process, the Team possesses discretion in whether to license a potential foster family, on what terms, or what children would be a good fit for the family. *See id.* ("The LRT reviews the licensing recommendation and training and support plan *and modifies either as needed.*" (emphasis added)); *id.* at 27 ("The LRT can also make modifications to the prospective foster family's placement recommendations or their training and support plan.").

92.   Should the Team decide to license a family for foster care, that license is still subject to a written agreement, which states "limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." *See* 110 CMR 7.111(4). And, as discussed, before any placement occurs, DCF must "provide the prospective foster/pre-adoptive parent[s] with sufficient information about the child to enable the foster/pre-adoptive parent[s] to determine whether to accept placement of the child." 110 CMR 7.112.

93.   DCF's regulations appear to give DCF discretion to license a family while taking into account their beliefs on gender and sexuality when making placement decisions. *See supra* ¶ 92 (discussing the written agreement requirement in 110 CMR 7.111(4), which "shall include" "a statement of any limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home."); *see also* Ex. 3 at 45 (explaining that the "recommendation" from the "Caregiver Assessment" inquiry is supposed to "take into account . . . the type of child

they want to foster and the capacities of the foster parent."); Ex. 4 at 2 ("The Department matches children to foster families who can best meet their needs and maintains an electronic record of affirming placements that can best support the needs of LGBTQIA+ children.").

94.   A license denial prevents a family from fostering or adopting children from the Massachusetts child welfare system. It could also prohibit or make it more difficult for a family to serve as kinship caregivers for loved ones, receive approval for a private adoption, volunteer with DCF, or foster and adopt children in another jurisdiction.

### *Placement of children*

95.   After a foster family is licensed, placement decisions are made by DCF. "All out-of-home placement decisions shall be made in the best interests of the child, based upon safety, well-being and permanency of the child and the child's individual needs." 110 CMR 7.101(1). The "best interest of the child" standard is highly subjective, allowing DCF to weigh 12 different factors. *See id.* at (1)-(3); *see also id.* ("Every reasonable effort should be made to place a child in accordance with [these factors].").

96.   When a kinship placement is not possible, DCF next tries to place a child in a stable home with a foster family that can meet the child's needs. *See id.* at (2).

97.   "Fit" is the essential goal of the social worker's evaluation of the potential foster family. That is, the social worker's recommendation whether to license a potential family must "take into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster and the capacities of the foster parent." Ex. 3 at 45.

98.   To that same end, "[b]efore a child is placed in a foster/pre-adoptive home, the Department shall provide the prospective foster/pre-adoptive parent[s] with sufficient information about the child to enable the foster/pre-adoptive parent to determine whether to accept placement of the child." 110 CMR 7.112. This

information includes "the service plan for the child, behavior management guidelines and techniques, the child's medical needs, the child's educational needs, current health and education information and/or records available, legal status and any other special conditions or requirements." *Id.*

99.   Moreover, DCF requires that foster parents enter into written agreements with foster families upon receiving a license. 110 CMR 7.111. These agreements are "renewed annually, and shall include" "a statement of any limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." *Id.* at (4); *see also id.* at 7.104(q) (potential foster parents are evaluated based on whether they can "assume and carry out all other responsibilities of a foster/pre-adoptive parent as detailed in the standard written agreement between the Department and foster/pre-adoptive parents."). This way, families who may not be able to foster certain children are still able to foster those that fit well with that foster family.

100. After a placement is identified, DCF must "provide the prospective foster/pre-adoptive parent[s] with sufficient information about the child to enable the foster/pre-adoptive parent to determine whether to accept placement of the child." 110 CMR 7.112.

101. Thus DCF's screening, licensing and placement procedures require individualized assessments and contain great discretion at every step.

### *DCF trains and screens the Burkes*

102. Mike and Kitty applied to become resource parents in January 2022. They underwent numerous hours of training, which they completed successfully. They also underwent extensive interviews and an examination of their home.

103. For example, in May and June 2022, Mike and Kitty attended the Western Regional MAPP Training, which is required of all prospected resource parents. The

training took place over several sessions that spanned multiple weeks. Mike and Kitty participated in every session.

104. Their instructor reported their positive contributions in the class to DCF, noting that Mike and Kitty "seem to have a solid understanding of how trauma can affect people, as Mike spoke openly about his PTSD as a Veteran. Both were active participants throughout MAPP and their comments often helped to enrich the training. It is anticipated that they will work cooperatively with DCF throughout their adoption journey." Ex. 1 at 14.

105. The MAPP training covered numerous topics related to the care of foster children. Mike and Kitty were taken aback during one of the sessions that discussed care for LGBTQ children. An instructor stated that parents who were not willing to affirm same-sex relationships and transgender identities should not be resource parents.

106. After the class, a DCF employee expressed a somewhat more moderate tone, essentially stating that this wasn't the case and that DCF understood that there were people of different backgrounds there.

107. The experience left the Burkes fearful that they would be discriminated against due to their Catholic religious beliefs.

108. As part of their application process, Mike and Kitty were forthright about their physical and mental health history and their experience with infertility. They provided DCF with letters from their doctors and therapists. They believed, and continue to believe, that they were prepared to welcome children into their home and provide them with the love and care they need.

109. In October 2022, the Burkes also underwent several hours of home interviews, conducted over three meetings.

110. Linda-Jeanne Mack of 18 Degrees, which performs some screening work for DCF, conducted those home interviews.

111. During the home interviews, the Burkes were troubled that much of the questioning centered around their views on sexuality and their response if a child were, in the future, to struggle with gender dysphoria or to identify as gay or lesbian. They estimate that a third of the time in the interviews was spent on these questions.

112. In response to those questions, Mike and Kitty emphasized that they would love and accept their child, no matter his or her future sexual orientation or struggles with gender identity. When asked "how they'd feel if their child identified as Lesbian, Gay, Bisexual, Queer, or any other sexuality. Kitty shared, 'there's nothing wrong with it, I'm going to love you the same, but I believe you would need to live a chaste life.'" Ex. 2 at 10. Mike agreed that "there's nothing wrong with it." *Id*. He said that "he'd want to have a conversation with a child about this" at an appropriate time and reiterated that "there would not be a change" in how the Burkes would treat or love the child. *Id*.

113. The Burkes also gave examples of friends and family members whom they loved and supported. Mike expressed that "he has been to 'many friends' weddings who have been gay.' [Mack] asked about how he reconciled this with his religion." *Id*. at 12. Mike "shared that Catholics do not hate lesbians or gay people it is the act that they have an issue with because they look at marriage as between a woman and a man and that sex is an act of marriage. . . . Mike said he would likely attend his child's wedding if they married someone of the same sex regardless of his beliefs." *Id*.

114. The Burkes also conveyed their Catholic religious beliefs that marriage is between a woman and a man and that sexual relations are to be kept within the bounds of such a marriage.

115. They further shared their religious views on gender identity. They believe in love and respect for everyone, and they believe that sex is immutable. Due to their religious beliefs, they would not assist a medical gender transition for a hypothetical

future child. Kitty also expressed her concerns about rushing into medical transition, and the current divide of professional opinion on best practices in such cases.

116. The Burkes explained to Mack that they would want to have frank, loving conversations with the child before any life-altering surgeries to fully understand what else might be going on in that child's life. Regardless of the child's actions, the Burkes would continue to love that child.

117. Mack "directly asked Kitty if she would throw a child out of the home or send a child to conversion therapy." *Id.* at 11. After hearing Mack's definition of conversion therapy, "Kitty said she would never throw a child out who is LGBTQIA+ and would not use what [Mack] described conversion therapy to be." *Id.*

118. Mike and Kitty expressed their openness to a child of any racial, ethnic, or cultural background. They also expressed their openness to a child with special needs.

119. Due to Kitty's prior experiences supporting special needs children, and limitations on heavy lifting, she did not believe that the Burkes would be well suited to a teenager who required lifting or carrying, or to a child with autism. But the Burkes recognized and were prepared for the possibility that disabilities may develop or become apparent long after adoption.

120. They also expressed their willingness to foster and adopt a child who had other forms of disability. They are prepared to help a child with mental health struggles, and their personal experiences have prepared them to care for a child in that circumstance. They are also prepared to welcome a child with other disabilities, such as hearing impairment. The Burkes have studied some American Sign Language.

121. When considering pre-adoptive homes, DCF regulations state that "priority will be given to those who are interested in the kinds of children currently waiting for and in need of homes. This includes, but is not limited to, the following types of

children: school age, special needs, legal risk, siblings, Black, Hispanic, and mixed racial."

122. The Burkes are willing to care for children of school age, with special needs, sibling groups, and Black, Hispanic, and mixed racial children.

### DCF denies the Burkes on a discriminatory basis

123. In her report of her meeting with the Burkes, Mack noted that "[t]he couple does have a lot of strengths . . . and really seems to understand adoption/foster care." Ex. 1 at 12.

124. However, Mack said that she was concerned because of the Burkes' beliefs about gender and sexuality and whether they would be "supportive of LGBTQIA+ youth." *Id.* She wrote in her summary of that initial meeting that "their faith is not supportive and neither are they." *Id.*

125. Later, when submitting a final draft of her license study to her manager, Mack told the Burkes' caseworker that she "did recommend approval with conditions, specifically around religion and LGBTQIA++ related issues." *Id.* at 9.

126. The report also highlighted the Burkes' "many strengths." Ex. 2 at 15. Specifically, Mack wrote that because of the Burkes' "own mental health and history of traumatic experiences, [Mack] believe[d] that they would be able to truly connect and support a child in a meaningful way. They are aware of how to care for themselves and can envision themselves using their own self care to help a child placed in their home. They have also spent significant time researching the unique challenges faced by children in foster care and children who have experienced adoption. They have clearly put a great deal of thought into their plan to adopt through the Department of Children and Families." *Id.* Mack "believe[d] that Kitty and Mike's mental health histories will be an asset to them." *Id.*

127. Despite these significant strengths, Mack expressed "apprehension about recommending [the Burkes] as a resource family due to the couple's views related to

people who identify as LGBTQIA++. . . . They are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way." *Id.*

128. Mack admitted that she "d[id]n't want to let [her] bias play in," but still wanted to see "notes" about how this "played out in MAPP." Ex. 1 at 12-13. This is where "one MAPP instructor said that DCF would not work with" the Burkes. *Id.*; *supra* ¶ 105.

129. The Burkes' religious beliefs about gender and sexuality were the only reason given for Mack's apprehension. She sent her report to DCF.

130. The Burkes' caseworker at DCF was their primary point of contact for the licensing study.

131. After the completion of the interviews as well as all training and background material, the Burkes' caseworker told them, "I confirmed with my supervisor yesterday, she approved your license study. It now sits with management team for their review and decision. At this time, I have not been informed of anything else being required of your family. You are one step closer." Ex. 1 at 6.

132. The Burkes were excited and anticipated being approved and, after many years of waiting, welcoming a child into their home.

133. On March 31, 2023, the Licensing Review Team met to review the Burkes' file.

134. The Licensing Review Team consisted of Anna Moynahan, Regional Clinical Director at DCF; Theresa Harris, Regional Program Manager at DCF; Dawn Sweetman, an Adoption Development Licensing Unit Supervisor; Tywanna Jones, the Burkes' caseworker; Caitlyn Levine, a mental health specialist at DCF; Euphemia Molina, a License and Training Supervisor at DCF; Stacy Clark a Quality Assurance Supervisor at DCF; Luz Estrada, a License and Training Supervisor at DCF; and Angel Emerson, a License and Training Supervisor at DCF.

23

135. As members of the LRT, each of these individuals was personally and directly involved in the decision on the Burkes' license.

136. The Licensing Review Team is under the control of DCF, and DCF is also responsible for the licensing decision made by the Licensing Review Team.

137. The Licensing Review Team, like Mack, believed that the Burkes had significant strengths as potential resource parents. The Licensing Review Team noted that these strengths included the Burkes' "willingness to parent a child w/ moderately significant medical, mental health and behavioral needs, their openness to maintaining birth family connections and resiliency regarding their respective mental health." *Id.* at 3.

138. Despite these many strengths, the LRT went further than Mack. While Mack had "recommend[ed] approval with conditions, specifically around religion and LGBTQIA++ related issues," the LRT decided to deny Mike and Kitty's application. The reason was clear: "Issue(s) of concern for which the couple's license study was denied is based on the couple's statements/responses regarding placement of children who identified LGBTQIA." *Id.*

139. The LRT's notes do not indicate any reason for the denial other than Mike and Kitty's beliefs and practices regarding sex, sexual orientation, and gender identity.

140. After the meeting, the Burkes' caseworker informed them that "the LRT's decision was to not approve their license study." *Id.* at 2.

141. The LRT accepted the license study written by Mack, while making its own additions to that study, summarizing DCF's conclusions based on Mack's stated concerns. LRT adopted Mack's statements and concerns, but exercised DCF's unfettered discretion to produce a more extreme response: not an "approval with conditions," but an outright denial.

142. The license study concluded, "Based on this families [sic] beliefs about children who identify as LGBTQIA+ and after a careful review of this assessment by the regional DCF licensing and training review team, the Department is unable to issue a license for them to foster/adopt at this time." Ex. 2 at 15.

143. The Burkes later received a letter stating that DCF was "not able to license you and your home as an unrestricted foster or adoptive family" because "there are specific licensing standards which have not been met." Ex. 5 at 1.

144. The letter cited the requirement that parents "support[] and respect[] a child's sexual orientation or gender identity" and "respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background" as the unmet licensing requirements. *Id.*

145. After so many years of hoping to welcome a child, the Burkes were devastated.

### *The Burkes appeal the ruling*

146. The Burkes asked for an explanation for the ruling. They received a one-page letter citing two standards used to assess foster parents.

147. The Burkes timely requested a Fair Hearing. They also requested, as part of that process, a copy of their file.

148. When they received the file, the Burkes were shocked to see the openly discriminatory statements and decisions made by DCF.

149. The Burkes then requested additional information on the denial.

150. In light of this information, the Burkes believe that further appeals within DCF would be futile. They withdrew their request for a fair hearing on June 22, 2023.

151. The Burkes now believe that their only hope is to seek judicial relief and a change to DCF's discriminatory policies.

152. But for DCF's discrimination, the Burkes would be approved resource parents today.

153. But for DCF's discrimination, the Burkes would be preparing to welcome children into their home.

154. But for DCF's discrimination, one of the children in Western Massachusetts currently waiting for a home could be with the Burkes today.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983

### Violation of the First Amendment of the U.S. Constitution
### Free Exercise Clause—Not Generally Applicable: System of Individualized Assessments

155. The Burkes incorporate by reference all preceding paragraphs.

156. The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

157. The First Amendment applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

158. "[A] plaintiff may carry the burden of proving a free exercise violation in various ways." *Kennedy*, 142 S. Ct. at 2421-2422. One way is to show that a government policy is not "generally applicable." *Id.* at 2422.

159. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). This is true "regardless whether any exceptions have been given, because [such systems] invite[] the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 1879 (cleaned up).

160. Here, DCF's licensing of potential foster families is an individualized assessment, governed by its own discretion.

161. Each time DCF decides whether to license a potential resource family, DCF makes an individualized assessment of the family.

162. At every stage of assessment and placement, DCF possesses discretion in whether or how it can apply its inquiries. It is, for instance, the sole arbiter of what it means for a potential foster family to "demonstrate, to the satisfaction of the Department," that they are "supporting and respecting a child's sexual orientation or gender identity." *See* 110 CMR 7.104(1)(d).

163. DCF's placement policies and family agreements consider parental abilities, family expertise, and preferences on issues like age, disability, and other protected characteristics.

164. The denial of the Burkes' application to serve as foster parents substantially burdens their religious exercise because it forces them to choose between the opportunity to become foster and adoptive parents for children in need and maintaining their religious beliefs.

165. DCF's ultimate decision to deny the Burkes' application was based on an individualized assessment of their religious beliefs.

166. "Several open-ended regulations and policies give the Department broad discretion—case-by-case—to prohibit people from participating in foster care because their sincere religious beliefs conflict with Department LGBTQ+ policy." *Blais*, 493 F. Supp. 3d at 996.

167. DCF must therefore face strict scrutiny for its denial of the Burkes' license. DCF cannot come anywhere close to this demanding standard.

168. Given the overlapping prohibitions on religious discrimination and DCF's ample discretion to use placement decisions that both uphold those policies and also provide support and respect for children who identify as LGBTQ, the choice to categorically exclude the Burkes from a foster case license because of their religious beliefs cannot be a compelling interest.

169. Nor is DCF's policy of denying licenses to families that hold certain religious beliefs narrowly tailored to achieve a compelling government interest. *See Blais*, 493 F. Supp. 3d at 1000 ("The Department has not shown that it lacks other ways to achieve its desired goal without imposing a substantial burden on the [Burkes'] exercise of religion.").

170. The Burkes have suffered and will suffer irreparable harm absent relief.

171. Defendants acted contrary to clearly established law when they took adverse action against the Burkes.

**Count II**
**42 U.S.C. § 1983**

**Violation of the First Amendment of the U.S. Constitution**
**Free Exercise Clause—Not Generally Applicable: Categorical**
**Discrimination**

172. Plaintiffs incorporate by reference all preceding paragraphs.

173. Another way in which a policy is not generally applicable is if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (emphasis in original); *see also Fulton*, 141 S. Ct. at 1877; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see also Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *5 (3d Cir. Mar. 1, 2022) ("the individual-capacity defendants do not identify a neutral, generally applicable basis for their treatment of the Lasches").

174. Comparability is not determined by government labeling, but by "the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296.

175. Here, DCF's evaluation of potential religious foster families is not generally applicable because its policies deploy categorical exemptions that treat secular activity more favorably than religious exercise.

176. For example, DCF regulations contain waiver provisions for multiple secular qualities considered in the caregiver assessment—including home capacity

28

limitations (*see* 110 CMR 7.104(5) (citing 7.105); *see also* 7.105(12)(b)) and legal resident status (*see id.* at 7.104(6); *see also id.* at 7.105A (waiver provision)). No such exemptions exist for religious perspectives on "supporting and respecting" a child's sexual orientation or gender identity, although that inquiry is part of the same caregiver assessment. *See id.* at 7.104 (1)(d).

177. In addition, DCF allows foster families to categorically exclude foster children from their homes via written "limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." *See* 110 CMR 7.111(4). Yet DCF refuses to use this mechanism to alleviate any concerns it has about placement of particular children in the Burkes' home. Instead, it excluded them based upon their religious beliefs.

178. Because DCF's regulations are not generally applicable, they trigger strict judicial scrutiny.

179. DCF's overlapping protections against religious discrimination, the categorical exclusions it also provides to caregiver assessment inquiries, and the discretionary nature of how to measure "support[] and respect," confirms that DCF cannot establish a compelling government interest.

180. Moreover, DCF regulations confirm that it has lesser restrictive means to uphold its interest rather than treat religious exercise worse than other activity.

181. The Burkes have and will continue to suffer harm absent relief.

182. Defendants acted contrary to clearly established law when they took adverse action against the Burkes.

**Count III**
**42 U.S.C. § 1983**

**Violation of the First Amendment of the U.S. Constitution**
**Free Exercise Clause—Not Neutral: Religious Hostility**

183. The Burkes incorporate by reference all preceding paragraphs.

184. The First Amendment requires equal treatment of all religious faiths without discrimination against one set of religious beliefs or practices.

185. Among other things, this guarantee means that "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that [courts] 'set aside' such policies without further inquiry." *Kennedy*, 142 S. Ct. at 2422 n.1 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018)).

186. Throughout the Burkes' application process, they experienced hostility toward their Catholic beliefs. This included the caregiver assessment noting that the Burkes' "faith is not supportive and neither are they." Ex. 1 at 12. That same assessment expressed "apprehension about recommending [the Burkes] as a resource family due to the couple's views related to people who identify as LGBTQIA++," noting that the Burkes are "heavily involved in their Catholic Church and cit[ing] their religious views as the primary reason for seeing LGBTQIA++ individuals in this way." Ex. 2 at 15.

187. Rather than express concern or disavow that statement, DCF adopted it and gave it legal force. DCF itself could not have been clearer: "The LRT clinical decision was that family, Kitty and Mike, would not be affirming to a child who identified LGBTQIA." DCF amended and ratified the license study, concluding "the Department is unable to issue a license for [the Burkes] to foster/adopt at this time," and the only reason given was "[b]ased on this families [sic] beliefs about children who identify as LGBTQIA+." *Id.*

188. These actions were "inappropriate for a [Department] charged with the solemn responsibility of fair and neutral enforcement of [the state's] antidiscrimination law—a law that protects against discrimination on the basis of religion as well as sexual orientation." *Masterpiece*, 138 S. Ct. at 1729.

189.  DCF's official hostility toward the Burkes' religious beliefs is the reason why they are not foster parents today. That official hostility violates the Free Exercise Clause.

190. Strict scrutiny is not a defense in cases of overt religious hostility. *See Kennedy*, 142 S. Ct. at 2422 n.1 (citing *Masterpiece*, 138 S. Ct. at 1732).

191. The Burkes have suffered and will suffer harm absent relief.

192. Defendants acted contrary to clearly established law when they took adverse action against the Burkes.

### Count IV
### 42 U.S.C. § 1983

### Violation of the First Amendment of the U.S. Constitution
### Free Exercise Clause—Not Neutral: Religious Gerrymander

193. Under the Free Exercise Clause, it is "never permissible" to target religious beliefs and religious status for disfavored treatment. *Lukumi*, 508 U.S. at 533. Accordingly, imposing "special disabilities on the basis of religious views" triggers strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460-61 (2017). "A law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022).

194. Because the Free Exercise Clause "forbids subtle departures from neutrality," *Lukumi*, 508 U.S. at 534, "[c]ourts must carefully review how the law works in practice to thwart 'religious gerrymanders.'" *Blais,* 493 F. Supp. 3d at 995 (quoting *Lukumi*, 508 U.S. at 533). "Regardless of how the benefit and restriction are described," a "program [that] operates to identify and exclude otherwise eligible [entities] on the basis of their religious exercise" "violates the Free Exercise Clause of the First Amendment." *Carson*, 142 S. Ct. at 2002.

195. Here, DCF interprets "supporting and respecting" a child's sexual orientation and gender identity to categorically exclude faithful Catholics from becoming foster

parents. This interpretation turns 110 CMR 7.104(a)(1)(d) into a religious gerrymander. *See Blais*, 493 F. Supp. 3d at 996 ("While [DCF] regulations and policies' secular purpose assuredly have the best interests of children at heart, in practice, these laws work to preclude people with certain religious beliefs from participating in foster care.").

196. This gerrymander shows that DCF welcomes certain religious beliefs and faith-based recruitment (*supra* ¶¶ 62-69), but for religious traditions with religious beliefs on human sexuality like those held by the Burkes, they need not apply.

197. DCF's interpretation of its regulations operates as an exclusion of not only faithful Catholics, but also faithful members of other religious traditions, from serving as foster parents and/or adopting children from the Massachusetts child welfare system.

198. It is "odious to our Constitution" for the Burkes to continue adhering to their Catholic beliefs "at the cost of automatic and absolute exclusion from the benefits of a public program for which [they were] otherwise fully qualified." *Carson*, 142 S. Ct. at 1996 (cleaned up); *see also Blais*, 493 F. Supp. 3d at 1001 (holding so as to potential foster parents). Such a decision must survive the "strictest scrutiny." *Carson,* 142 S. Ct. at 1997.

199. DCF does not have a compelling interest in denying the Burkes a foster care license based on their religious beliefs. Nor could any such interest be coherent, considering the overlapping prohibitions on religious discrimination in Massachusetts law, DCF regulation, and DCF policy. *See also Blais*, 493 F. Supp. 3d at 1002 (citing state law to hold that, "[i]f the only factor weighing against an otherwise qualified applicant has to do with their sincerely held religious beliefs, the Department must not discriminate against a foster care applicant based on their creed.").

200. DCF's policy of denying licenses to families that hold certain religious beliefs is not narrowly tailored to achieve a compelling government interest.

201. The Burkes have suffered and will suffer harm absent relief.

202. Defendants acted contrary to clearly established law when they took adverse action against the Burkes.

**Count V**
**42 U.S.C. § 1983**

**Violation of the First Amendment of the U.S. Constitution**
**Free Speech Clause—Compelled Speech**

203. Plaintiffs incorporate by reference all preceding paragraphs.

204. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

205. Accordingly, a government has no power to "allow[] a government to coerce an individual to speak contrary to her beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own." *303 Creative v. Elenis*, 143 S. Ct. 2298, 2318 (2023). This is true even when a government is insisting on antidiscrimination requirements against public accommodations. *See id.* at 2319 ("no government may affect a speaker's own message by forcing her to accommodate views she does not hold.") (cleaned up).

206. DCF denied the Burkes' application because they expressed their religious views about gender and human sexuality and because those views conflicted with DCF's preferred view.

207. DCF has conditioned its approval of the Burkes' application on their willingness to affirm DCF's preferred view of gender and human sexuality.

208. DCF does not have a compelling interest in forcing the Burkes to affirm a viewpoint with which they do not agree.

209. DCF's policy of denying licenses to families that hold certain religious beliefs is not narrowly tailored to achieve a compelling government interest.

210. The Burkes have suffered and will suffer harm absent relief.

211. Defendants acted contrary to clearly established law when they took adverse action against the Burkes.

### PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

a. Declare that the First and Fourteenth Amendments to the United States Constitution require Defendants to cease discriminating against Plaintiffs and those who share Plaintiffs' religious beliefs on the basis of their religious beliefs, exercise, and expression;

b. Declare that defendants cannot construe 110 CMR 7.104(1)(D) to operate as a religious exclusion for potential foster parents;

c. Issue preliminary and permanent relief prohibiting Defendants, their agents, employees, and those acting in concert with any of them from declining to issue a foster care license to Plaintiffs on the basis of their religious beliefs, speech, and exercise on the issues of marriage, human sexuality, and gender identity;

d. Issue preliminary and permanent relief prohibiting Defendants, their agents, employees, and those acting in concert with any of them from construing and/or applying their policies to discriminate against prospective foster parents on the basis of their religious beliefs, speech, and exercise on the issues of marriage, human sexuality, and gender identity;

e. Issue preliminary and permanent relief requiring Defendants, their agents, employees, and those acting in concert with any of them to expunge or amend the Burkes' file so that it no longer reflects Defendants' discriminatory statements, actions, and denial, and to take any further appropriate actions to prevent further harm from the discriminatory denial;

f.  Award Plaintiffs nominal and compensatory damages against Defendants in their personal capacities;

g.  Award Plaintiffs the costs of this action and reasonable attorney's fees; and

h.  Award such other and further relief as the Court deems appropriate and just.

/s/ Michael Gilleran
Michael Gilleran
 BBO No. 192210
Fisher Broyles, LLP
75 State Street
Suite 100
Boston, MA 02109
(781) 489-5680

Lori Windham*
 DC Bar No. 501838
William J. Haun*
 DC Bar No. 1024405
Benjamin Fleshman*
 DC Bar No. 1781280
The Becket Fund for Religious Liberty
 1919 Pennsylvania Ave, N.W.
Suite 400
Washington, DC 20006
(202) 955-0095

*Application for admission
*pro hac vice* pending

## VERIFICATION

I am over the age of 18 and am a Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C § 1746, that I have read the foregoing VERIFIED COMPLAINT, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.


Executed on:   August 7, 2023


Michael Burke

## VERIFICATION

I am over the age of 18 and am a Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C § 1746, that I have read the foregoing VERIFIED COMPLAINT, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

Executed on:   August 7, 2023

Catherine Burke